In the

# United States Court of Appeals
## For the Seventh Circuit

No. 25-1962

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

LUISITO ESPANOLA,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Central District of Illinois.
No. 4:24-cr-40002 — **Sara Darrow**, *Judge.*

ARGUED APRIL 10, 2026 — DECIDED JULY 1, 2026

Before ROVNER, ST. EVE, and PRYOR, *Circuit Judges.*

ST. EVE, *Circuit Judge.* At Luisito Espanola's trial on wire
fraud and money laundering charges, the government intro-
duced a series of WhatsApp messages between him and an
uncharged co-conspirator in which they discussed, in real
time, their commission of the charged crimes. The jury con-
victed. Espanola now requests a new trial, arguing that the
district court erred in admitting the messages into evidence.
We disagree and affirm.

## I. Background

In December 2020, someone impersonating a contractor for the City of Moline, Illinois, emailed the city to ask that it make future payments to a new bank account, one held at Washington Federal Bank. The city complied—not recognizing the subtle difference between this email account's domain and that belonging to the real contractor—wiring the account almost $223,000 on December 16 and just over $198,000 on December 30. But eventually, the real contractor asked the city where its money was, and thus began an investigation. It turned out that the Washington Federal Bank account belonged to Luisito Espanola, who had opened it earlier that year in the name of GS International, LLC, an entity he alone controlled.

The government's investigation revealed that Espanola immediately began moving the funds he received. On the same dates he received each of the city's wire transfers, he wrote checks for approximately the same amount of each transfer and then deposited them into a Citibank account he had opened a month prior. From there, he bought cryptocurrency and sent money to other entities.

In time, a federal grand jury returned a four-count indictment against Espanola. The indictment charged two counts of wire fraud under 18 U.S.C. § 1343 and two counts of money laundering under 18 U.S.C. § 1956(a)(1)(B)(i).

During discovery, the defense produced, and included on its exhibit list, a piece of evidence that ultimately became a cornerstone of the government's case: A WhatsApp chat log in which Espanola and an uncharged co-conspirator planned and discussed their commission of the crimes in real time. Es-

panola produced this evidence under Federal Rule of Criminal Procedure 16(b)(1)(A), which requires disclosure of documents and objects "within the defendant's possession, custody, or control" and that "the defendant intends to use" in his "case-in-chief at trial." This obligation kicks in only if the defendant demands (as Espanola had), under Rule 16(a)(1)(E), that the government turn over documents and objects within its control to which he is not otherwise entitled.

The WhatsApp messages were incriminating. In November 2020, for example, Espanola provided updates as he opened the account he used to launder the city's money. Citibank records corroborated these messages. And in December, Espanola kept his co-conspirator apprised as he moved the city's wire transfers from Washington Federal Bank to Citibank and beyond. Records from Espanola's bank and cryptocurrency exchange again corroborated the details of these transactions. The conversation also included personally identifiable information—Espanola's name, email address, and mailing address.

Prior to trial, the government moved in limine to admit this chat log, which it hoped to use in its case-in-chief. In order to authenticate the chat log, the government had to "produce evidence sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901(a). Sufficient evidence may include "[t]he appearance, contents, substance, internal patterns, or other distinctive characteristics of the item, taken together with all the circumstances." *Id.* 901(b)(4).

To satisfy Rule 901, the government relied on Espanola's production of the messages under Rule 16(b)(1)(A) and inclusion of them on his exhibit list, as well as their distinctive char-

acteristics. Espanola objected, disputing that his conduct indicated the messages' authenticity and urging that only a party to the conversation could authenticate it. The district court agreed with the government and admitted the messages into evidence.

The case proceeded to trial, where among other evidence the government relied on the WhatsApp messages to establish Espanola's guilt. When the government rested, Espanola elected against testifying or otherwise putting on a defense. The jury ultimately found him guilty on all counts, and the court sentenced him to 32 months' imprisonment.

## II. Discussion

Espanola's appeal raises just one question: Does interpreting the "circumstances" that can support authentication under Federal Rule of Evidence 901(b)(4) to include a defendant's production under Federal Rule of Criminal Procedure 16(b)(1)(A) violate the defendant's right to testify?[1] We hold it does not. But even if the district court's interpretation was erroneous, we would nonetheless affirm based on the overwhelming evidence, separate from Espanola's production, authenticating the chat log.

### A. Right to Testify

Criminal defendants enjoy a well-established, if unenumerated, right to testify in their own defense. *See Rock v. Arkansas*, 483 U.S. 44, 49 (1987). The "accused's right to present

---

[1] The parties dispute whether Espanola forfeited his argument on appeal, particularly in view of our recent decision in *United States v. McKay*, 176 F.4th 537 (7th Cir. 2026). Because Espanola's argument fails under de novo review, we need not address the question of preservation.

his own version of events in his own words," *id.* at 52, is "an integral part of the right to present a complete defense," *Fieldman v. Brannon*, 969 F.3d 792, 801 (7th Cir. 2020). But it is not absolute—various "procedural and evidentiary rules" may "control the presentation of evidence" without "offend[ing] the defendant's right to testify." *Rock*, 483 U.S. at 55 n.11. That said, "when an evidentiary ruling infringes upon a weighty interest of the accused and is arbitrary or disproportionate to the purposes the rule is designed to serve, then the applicable … rule[] must yield to the defendant's fundamental due-process right to present a defense." *Fieldman*, 969 F.3d at 801 (cleaned up). Only on "rare[]" occasions has the Supreme Court (and our court) applied this test to conclude that the exclusion of defense evidence infringed the defendant's constitutional rights. *Nevada v. Jackson*, 569 U.S. 505, 510 (2013); *see, e.g.*, *Fieldman*, 969 F.3d at 802–10.

In *Rock*, for example, the Supreme Court held that Arkansas's per se rule barring the introduction of hypnotically refreshed testimony violated the defendant's right to testify on her own behalf. 483 U.S. at 56–62. The rule "had a significant adverse effect on [her] ability to testify" because it "virtually prevented her from describing any of the events that occurred on the day [in question]." *Id.* at 57. Similarly, in *Crane v. Kentucky*, 476 U.S. 683 (1986), the Court held that the blanket exclusion of the defendant's testimony about the circumstances of his confession violated his constitutional rights where that testimony was reliable and central to his claim of innocence. *Id.* at 684–91. And in *Fieldman*, we applied these principles to grant a writ of habeas corpus where a state trial court improperly barred the defendant from offering testimony essential to his defense. *See* 969 F.3d at 802–10.

Espanola urges that his case falls within these precedents. As he sees it, the district court's consideration of his Rule 16(b)(1)(A) production as one "circumstance" supporting authentication under Rule 901(b)(4) infringes his right to testify by presenting him with an impossible choice. Either he produces the evidence, and thereby risks the government's reliance on that production to authenticate it, or he withholds it, and thereby risks the inability to testify about it. And that choice, Espanola claims, forces him "to choose whether he will testify, and in what manner, before he ever hears the government's case against him." Espanola therefore asks that we reject the district judge's interpretation under the canon of constitutional doubt, which "teaches that when two interpretations of a statute are 'fairly possible,' one of which raises a 'serious doubt' as to the statute's constitutionality and the other does not, a court should choose the interpretation 'by which the question may be avoided.'" *United States ex rel. CIMZNHCA, LLC v. UCB, Inc.*, 970 F.3d 835, 846 (7th Cir. 2020) (quoting *Zadvydas v. Davis*, 533 U.S. 678, 689 (2001)).

We do not have a "serious doubt" about the constitutionality of the district court's interpretation. Notice the chasm between the cases on which Espanola relies and his own circumstances: Whereas the former involve the exclusion of defense testimony, the latter concern the admission of government evidence. And it is not just *Rock*, *Crane*, and *Fieldman*—every Supreme Court decision in this line of cases has dealt with the exclusion of defense evidence, and our precedents have not extended the doctrine any further. *See, e.g.*, *Holmes v. South Carolina*, 547 U.S. 319, 323–24 (2006); *United States v. Scheffer*, 523 U.S. 303, 306–07 (1998); *United States v. Johnson*, 65 F.4th 932, 940 (7th Cir. 2023); *see also Gilmore v. Taylor*, 508 U.S. 333, 343 (1993) (jury instructions that prevented jury from consid-

ering affirmative defense did not violate defendant's right to present defense, as cases like *Rock* and *Crane* "dealt with the exclusion of evidence or the testimony of defense witnesses"). This outcome is unsurprising: Where a court does not bar, limit, or in any way hamper the defendant's ability to take the stand, it is hard to see how that court violated the "accused's right to present his own version of events in his own words." *Rock*, 483 U.S. at 52.

That principle, moreover, is intrinsic to the doctrine. Under the framework the Supreme Court has established, evaluating a claim like Espanola's requires us to ask whether the exclusion of evidence "infringes upon a weighty interest of the accused." *Fieldman*, 969 F.3d at 801 (cleaned up). Answering that question, in turn, requires evaluating the importance of the excluded testimony to the defense. *Compare id.* at 804–06 (constitutional violation where defendant's excluded testimony "went straight to the heart of his claim of innocence"), *and Rock*, 483 U.S. at 57 (constitutional violation where exclusion of defendant's testimony "virtually prevented her from describing any of the events that occurred on the day of the shooting" with which she was charged), *with Scheffer*, 523 U.S. at 316–17 (no violation where exclusion did "not implicate any significant interest of the accused" because he was "not prohibit[ed] … from testifying on his own behalf; he freely exercised his choice to convey his version of the facts to the" fact finder and was "barred merely from introducing expert opinion testimony to bolster his own credibility"). In Espanola's case, where the court did not exclude any evidence or otherwise impede Espanola's ability to testify, it is not clear how we could even apply these controlling legal principles.

Indeed, we recently reached this same conclusion under similar circumstances. In *Johnson*, the government belatedly disclosed a recording of a proffer statement the defendant had made upon his arrest. The government could have impeached the defendant with his statements made during the proffer had he testified at trial, but he ultimately elected against taking the stand. On appeal, he claimed a violation of his right to testify, contending (like Espanola) that the violation stemmed from a challenging strategic dilemma. Specifically, Johnson argued that the government's late disclosure put him to "a Hobson's choice—testify and risk impeachment with a lengthy recorded proffer he had no reasonable opportunity to review before trial, or not testify at all." *Johnson*, 65 F.4th at 940. And like Espanola, Johnson claimed that this predicament "caused essentially the same" constitutional violation as that recognized in *Rock* and *Fieldman*. *Id.*

We rejected this argument and held: "*Rock* and *Fieldman* do not extend to this case. In each of those cases, the trial court barred the defendant from offering certain categories of relevant testimony in his defense. Johnson retained the ability to choose whether to testify…." *Id.* So too here. In neither case did the court exclude or limit any defense testimony. And in both cases the defendant was free to, but elected against, testifying. The same result thus follows: As in *Johnson*, *Rock* and *Fieldman* do not extend to Espanola's case.

Espanola's attempt to distinguish *Johnson* on the grounds that the government already had the evidence in question, which was admissible only if the defendant chose to take the stand, similarly fails. Tying the admission of harmful evidence directly to the defendant's decision whether to testify would seem to impose a *greater* burden on the right to testify.

More fundamentally, Espanola's asserted distinction is not relevant because it fails to engage with *Johnson*'s reasoning. *Johnson* did not ask whether the government had the evidence in question or under what circumstances that evidence would become admissible. Its analysis was far simpler: *Rock* and *Fieldman* concerned a trial court barring the defendant from testifying in certain ways, but Johnson was free to testify, so *Rock* and *Fieldman* do not apply.

In sum, we do not have a "serious doubt" about the constitutionality of the district court's interpretation, so Espanola's challenge to the chat log's admissibility fails.

**B. Other Evidence of Authentication**

Even if Espanola persuaded us to have constitutional doubt, we would nevertheless affirm considering the overwhelming evidence—separate from the circumstances of discovery—supporting authentication. *See United States v. Courtright*, 632 F.3d 363, 369 (7th Cir. 2011) (district court's admission of evidence under erroneous interpretation of Federal Rules of Evidence is harmless if evidence was otherwise admissible); *United States v. Boone*, 628 F.3d 927, 933 (7th Cir. 2010) (endorsing the proposition that "we can affirm the admission of evidence on any proper basis regardless of whether that was the ground relied upon by the district court").

Recall that under Rule 901(b)(4), a proponent of a piece of evidence may satisfy the authentication requirement with evidence of "[t]he appearance, contents, substance, internal patterns, or other distinctive characteristics of the item, taken together with all the circumstances." The authenticity requirement does not demand certainty: the proponent need only

make "a prima facie showing of genuineness," and from there we leave it to the jury to "decid[e] the evidence's true authenticity and probative value…." *United States v. Fluker*, 698 F.3d 988, 999 (7th Cir. 2012).

Our application of Rule 901(b)(4) in *Fluker* is instructive. There, we upheld the authentication of emails the defendant's confederate, Haywood Borders, had purportedly authored. *See id.* at 998–1000. Though no one could testify that Borders in fact sent the emails, several pieces of circumstantial evidence sufficiently linked him to them. To begin with, the emails identified the author as "Haywood Borders," and the email address from which the author sent them was associated with an organization that Borders led. *Id.* at 999. That leadership position, moreover, would have given Borders access to the email addresses to which the author sent the messages. *Id.* And the messages themselves "demonstrate[d] the emails' author had significant knowledge" that "Borders would be in a position to know and discuss with the" emails' recipients. *Id.* at 1000.

This case is easier than *Fluker*. In short, Espanola's messages bear his identifying information, communicate information to which only he was privy, and disclose documents uniquely within his control—creating, in sum, circumstantial evidence that establishes far more than a "prima facie showing of genuineness." *Id.* at 999.

Start with identifying information. The chat log itself identifies one of the participants as "Luisito Espanola," the other participant referred to him as "Luis," and Espanola repeatedly provided his full name. Espanola's messages also provided the mailing address at which he resided and the email

address he used when registering his company and opening his bank accounts.

Next consider the information Espanola disclosed. Espanola provided the name and account numbers of bank accounts he personally opened and solely controlled. He also provided real-time updates on his application for, and Citibank's approval of, a bank account through which he laundered the City of Moline's deposits. Citibank records confirmed that Espanola indeed applied and received approval for a bank account on the dates depicted in the messages.

Last are the documents he transmitted. On both of the days that the city wired money to Espanola's Washington Federal Bank account, Espanola sent screenshots of his online banking platform depicting these deposits. Then, on each of these days, Espanola sent photographs confirming deposits by check into his Citibank account, and Citibank records confirmed the deposit of two checks signed by Espanola on these days. The same evidence—screenshots of Espanola's account and independent corroboration of the transaction—existed for Espanola's purchase of bitcoin with the funds from his Citibank account. In sum, then, the government easily authenticated the messages through their characteristics—excluding the circumstances of discovery.

Espanola does not deny the force of this circumstantial evidence. Instead, he argues that under Rule 901(b)(4), the court *must* consider the circumstances of discovery—which takes Rule 901(b)(4) off the table where (as Espanola contends is the case here) the court may not constitutionally consider those circumstances. He relies for that proposition on *United States v. Dumeisi*, where we stated: "The 'circumstances' which we must consider in conjunction with the physical characteristics

discussed above include circumstances surrounding discovery." 424 F.3d 566, 575 (7th Cir. 2005).

Espanola overreads that lone sentence. *Dumeisi* made only the more modest point that Rule 901(b)(4) requires consideration of the circumstances, and one potentially relevant circumstance is that of discovery. This understanding of *Dumeisi* is more consistent with the cases it cited, our more recent precedents, and the rule's text. First, the cases *Dumeisi* cited merely used the location in which law enforcement officers discovered an item as evidence of its authenticity. Neither case held nor suggested that Rule 901(b)(4) *requires* evidence of discovery. *See United States v. Harvey*, 117 F.3d 1044, 1049 (7th Cir. 1997); *United States v. Arce*, 997 F.2d 1123, 1128 (5th Cir. 1993). Second, in cases postdating *Dumeisi* (and citing it), we have repeatedly upheld authentication under Rule 901(b)(4) without examining the circumstances of discovery. *See, e.g.*, *Fluker*, 698 F.3d at 998–1000; *United States v. Law*, 990 F.3d 1058, 1064 (7th Cir. 2021). And third, imposing a categorical "evidence of discovery" requirement would be inconsistent with Rule 901(b)(4)'s "all the circumstances" language, which bespeaks a flexible, case-by-case inquiry. Accordingly, the WhatsApp messages were admissible whether or not the district court considered Espanola's production of them.

*        *        *

The judgment of the district court is

AFFIRMED.